# NEW YORK SUPREME COURT.

WILLIAM H. TAYLOR and WILLIAM A. DUNPHY, trustees, agt.
THE ATLANTIC AND GREAT WESTERN RAILROAD COMPANY,
THE BANQUE FRANCO-EGYPTIENNE *et al.*

*Railroad companies — Mortgage on railroad property in New York, Penn-*
*sylvania and Ohio — Consolidated corporations — Laws as to consolida-*
*tion — Continuous lines — New corporation may assume debts of its predeces-*
*sor — Mortgage bonds — where bonds refer to mortgage given for their security,*
*they operate as notice to parties receiving them, of contents of mortgage —*
*How far acts of railroad corporations to be sustained.*

The Atlantic and Great Western Railroad Company executed a mortgage
to the plaintiffs, as trustees, upon its line of railroad, extending from
Salamanca, in New York, to Dayton, in Ohio, covering property in the
states of New York, Ohio and Pennsylvania. The mortgage was made
to secure three classes or series of bonds, designated first, second and
third mortgage bonds. All of the bonds referred in terms to the mort-
gage given for their security. The railroad company was a consolidated
corporation, the constituent companies having been respectively formed
under the laws of New York, Ohio and Pennsylvania. The consoli-
dated company became the owner of the property under a scheme of
reorganization made by the bondholders of the constituent companies,
for the purpose of purchasing the property. The shareholders were
not parties to such reorganization scheme, but it appeared that the
divisional mortgages were of such a large amount, that practically the
shareholders had no interest in the property. Most of these bonds, viz.:
about $9,000,000 thereof were issued and used to replace bonds issued
by the constituent railroad corporations, some of which owned por-
tions of, and one of which had acquired title to all, the property of the
present corporation. The remainder of the bonds so issued, amount-
ing in no event, to more than about $7,000,000, were known as surplus
bonds, and were used in the purchase of steel rails, &c., and in the
borrowing of money for the use of the company. The banque, which
held a portion of such surplus bonds, viz.: $1,816,000, pledged to it as
collateral to a loan, the proceeds of which had been used by the rail-
road company in the purchase of necessary equipment, claimed that
such surplus bonds only were valid and existing obligations, and that
all of the other bonds had been illegally and improperly issued. The
whole amount of bonds issued was $56,000,000:

*Held,* that, as the bonds in terms referred to the mortgage given for their
security, and, consequently, operated as a notice to parties receiving

Taylor agt. Atlantic and Great Western Railroad Company.

them of the contents of such mortgage, the banque could not be permitted to claim that it took them in ignorance of any of the facts, the existence of which was disclosed by the statement of the mortgages.

*Held,* that while railroad corporations, as well as others, must be confined in their acts within the authority affirmatively given to them, or appropriately requisite for the attainment of the objects they are designed to accomplish, yet, if with that restriction their acts appear authorized, they are to be sustained the same as all other exertions of lawful authority.

*Held, further,* that the reorganization scheme was not unlawful; that it was not unlawful for the creditors and bondholders to agree that a sale should be made of property mortgaged, by way of security, for their debts, and that it should be purchased by the three trustees selected by them for their benefit.

*Held, further,* that the statutes of this state (*Laws* of 1861, *vol.* 2, *p.* 2399) do not inhibit or prevent the consolidation of two companies simply because one of the constituent companies was previously formed by the consolidation with another company; that the right to consolidate has been generally conferred upon all railroad companies existing as such, subject only to the conditions prescribed in the statute, that the railways must be so situated as to form a continuous line, and that they shall not be parallel or competing lines (*Id., p.* 2403, *sec.* 9).

*Held, further,* that the Ohio constituent corporation was properly formed under the laws of Ohio, referred to in the opinion.

*Held, further,* that the consolidation statute contains no prohibition preventing the new corporation from assuming the debts of its predecessors in whole or in part, but only exonerates the consolidated company from liability therefor; the privilege so conferred by the statute was waived by the consolidation agreement, pursuant to which the sale was made and the new corporation formed; that such agreement could be lawfully made, and that, therefore, the bonds issued by the new corporation for the payment of the obligations of the constituent companies were valid.

*Held, further,* that while subdivision 10 of section 28 of chapter 225 of the Laws of 1850, which provides that railroad corporations could, from time to time, borrow such sums of money as might be necessary for completing and furnishing or operating their roads and issue bonds for the money borrowed, and secure their repayment by a mortgage upon the corporate property and franchises (which section was rendered applicable to consolidated corporations by section 8, chapter 917 of the Laws of 1869), may have been designed to carry with it an implication that mortgage bonds could not be issued for any other purpose, yet, that, by section 2 of chapter 917 of the Laws of 1869, such limitation, as to consolidated companies, was removed.

*Held, further,* that the objection was not tenable that the railroad company was not empowered to assume the obligation for the security of these

Taylor agt. Atlantic and Great Western Railroad Company.

demands, *i. e.*, the existing debts of the constituent companies, by mortgage bonds, because antecedent mortgages were, by the terms of the statute (*Laws of* 1869, *p.* 2402, *sec.* 5), excepted from the obligations which are attached to, and rest upon, the new company; that the foreclosure sales, under the mortgages of the constituent companies, left the obligations simply debts, which are not inhibited, but, in terms, permitted by the general authority created by the act of 1869.

*Held, further,* that such assumption was not opposed to the legislative policy of this state relating to railroad corporations, for it has since been extended by other enactments, viz., by chapter 430 Laws of 1874, and chapter 446 Laws of 1876.

*Held, further,* that the laws of Pennsylvania, in the opinion referred to, literally authorized the consolidation and the reorganization scheme, and that the latter was also within the spirit and terms of the laws of New York and Ohio.

*Erie Special Term, December,* 1878.

THE plaintiffs are trustees under a railroad mortgage executed by the Atlantic and Great Western Railroad Company, on their property in the three states of New York, Ohio and Pennsylvania. The object of the suit is to foreclose such mortgage. The defendant, the Banque Franco-Egyptienne, intervened for its own interest, claiming, by its answer, that out of the $56,000,000 of bonds issued under the mortgage but about $7,000,000, at most, had any valid or legal existence. The banque held about $1,816,000 of such bonds as collateral security to a loan which it had made to the railroad company, and which had been used by the latter in the purchase of steel rails and other necessary equipment. In addition to the facts referred to in the opinion, the following history of the case must be noticed.

## HISTORY OF THE CASE.

Heretofore and on the 25th day of May, 1859, the Atlantic and Great Western Railroad Company of New York executed a mortgage upon its property in the state of New York to Samuel Marsh, as trustee, to secure the payment of certain bonds therein mentioned.

On the 1st day of April, 1861, the said company executed and delivered to the said Marsh a certain other mortgage or deed of trust, to secure the payment of certain bonds therein mentioned.

After the execution of the said mortgage, the said Atlantic and Great Western Railroad Company was consolidated with the Atlantic and Great Western Railroad Company of Ohio and the Atlantic and Great Western Railroad Company of Pennsylvania, under the name of the "Atlantic and Great Western Railway Company," and such consolidated company, on the fifth of April, 1865, issued a consolidated mortgage to one John R. Penn. This mortgage covered the property of the three companies in the three states, and was subordinate to the two mortgages to the said Marsh.

The two mortgages to the said Marsh were foreclosed by a suit in which the said Penn was joined as a defendant, and the mortgaged property described was, by the judgment of this court, entered March 21, 1871, and amended May 15, 1871, ordered to be sold by and under the direction of the Hon. Reuben Hitchcock, receiver, who was appointed referee for that purpose.

On the 4th day of August 1871, Mr. Hitchcock reported that he had sold the mortgaged premises to George B. McClellan, Allen G. Thurman and William Butler Duncan, trustees, on the 19th day of July, 1871, for the sum of $655,000, of which sum $150,000 was paid in cash. The report does not state how or when the balance was paid, though the deed speaks of "the said sum of money being first duly paid." McClellan, Thurman and Duncan certified, by a certificate filed August 5, 1871, that they had purchased the property subject to the terms of sale as stated by Mr. Hitchcock.

On the 5th of September, 1871, Mr. Hitchcock, as receiver, made a deed of the property sold to McClellan, Thurman and Duncan. This deed recites the proceedings under the foreclosures, the fact of the sale, the order confirming the sale, and conveys the property in question to McClellan, Thurman

and Duncan, "their successors and assigns, to their own proper use, benefit and behoof, forever, subject, nevertheless, to the lien of the said mortgage, or deed of trust, executed by the said Erie and New York City Railroad Company, to Sheppard Knapp and Lucien D. Coman, trustees, so far as the same may be a lien upon said premises."

On the 3d day of October, 1871, McClellan, Thurman and Duncan, with others, filed in the office of the secretary of state, articles of association of "The Atlantic and Great Western Railway Company of New York." These articles recite the foreclosure proceedings, the purchase by McClellan, Thurman and Duncan individually, and that such purchasers desired and intended to form a corporation for the purpose of "maintaining and operating the railroad" so purchased, "and now in public use." The amount of capital stock was fixed at $500,000, divided into 10,000 shares of fifty dollars each. McClellan, Thurman and Duncan signed these articles; and McClellan subscribed for one share, Duncan for 4,976 shares, and Thurman and all the rest of the incorporators for one share each.

On the 4th of October, 1871, McClellan, Thurman and Duncan conveyed the premises in question to this Atlantic and Great Western Railway Company of New York.

On the same 4th of October, 1871, the Atlantic and Great Western Railway Company of New York was consolidated with the Atlantic and Great Western Railway Company of Pennsylvania, under the name of "The Atlantic and Great Western Railway Company of New York and Pennsylvania," and the capital stock was fixed at $49,500,000. The stock of the original Pennsylvania company was $49,000,000, and that of the original New York company was $500,000, and the two aggregated the capital of $49,500,000 above mentioned. The articles provided that "the first annual election of said new corporation should be held at the office of said corporation, in the city of New York, on the first Wednesday in May, 1872, and that elections should be held annually there-

after at such place as the board of directors should, from time to time, designate." Ten millions of this stock were designated as preferred stock.

In the month of February, 1871, there was depending in the court of common pleas for Summit county, in the state of Ohio, a suit brought by John R. Penn, above mentioned, as trustee, to foreclose the consolidated mortgage executed by the Atlantic and Great Western Railway Company to him as trustee, as above set forth. Mr. Hitchcock was appointed master commissioner in such suit, and was also appointed receiver therein. On the 21st of February, 1871, the said Hitchcock, as such master commissioner and receiver, was directed, in case of the non-payment of the moneys in said decree mentioned, to sell the property covered by the said mortgage. On the 31st of August, 1871, Mr. Hitchcock reported to the said court of common pleas that he had had the property covered by the said mortgage, and subject to a prior mortgage to Flagg and Stedman, known as "The Ohio Divisional Mortgage," appraised at $6,653,233, and that on the 26th of July, 1871, he sold the mortgaged premises, subject to the incumbrance of the mortgage to Flagg and Stedman, to McClellan, Thurman and Duncan, for the sum of $4,435,500. Of this sum $580,000 was paid in cash and the balance was paid in outstanding mortgage bonds and coupons issued to one Upson upon the said premises in Ohio, and also outstanding bonds and coupons issued upon the said premises under said consolidated mortgage, and apportioned and divided between the divisions thereof occupied by the Atlantic and Great Western Railway Company of Pennsylvania, the Atlantic and Great Western Railway Company of Ohio, and the Atlantic and Great Western Railway Company of New York.

It appears from said report that the mortgage to the said Penn was also foreclosed by a like action in the supreme court of the state of Pennsylvania.

At the May term of 1871 of the said court of common

Taylor agt. Atlantic and Great Western Railroad Company.

pleas for Summit county, Ohio, the report of Mr. Hitchcock was confirmed, and he was directed, as special master commissioner, to execute and deliver to McClellan, Thurman and Duncan a deed conveying "to them and their heirs and assigns forever, all and singular the premises, property and franchises sold, free of all liens and incumbrances thereon, except such as are by said judgment or in the order issued to said Hitchcock specially reserved and mentioned, that is to say, first, the lien of the mortgages to Flagg and Schuchardt, and second, the stipulations in certain leases made to the Cleveland and Mahoning Railroad Company, and the chattel mortgage in said judgment mentioned."

On the 3d of October, 1871, Mr. Hitchcock conveyed the premises by deed to McClellan, Thurman and Duncan, subject to the mortgages to Flagg and Stedman, and to the rights of the Cleveland and Mahoning Railroad Company, and the rights of one Kent, a judgment creditor.

On the 16th of October, 1871, McClellan, Thurman and Duncan conveyed the premises purchased from Mr. Hitchcock under the Penn decree to George B. Wright, Reuben Hitchcock, Joseph Perkins, George Hickox and Morrison R. Waite, by deed specifying that the property conveyed was subject to the aforesaid liens of Flagg and Stedman, the Cleveland and Mahoning Company, and Kent.

On the 19th day of October, 1871, Wright, Hitchcock, Perkins, Hickox and Waite made, and filed in the office of the secretary of state of Ohio, a certificate of organization, reciting the purchase by them of the property aforesaid, and that they were " desirous of becoming a corporation under and by virtue of the provisions of an act passed May 7, 1869, entitled 'An act supplementary to an act entitled "An act to authorize receivers of insolvent railroad companies to sell unfinished roadbeds and franchises," passed May 14, 1868,' now, therefore, the said Wright, Hitchcock, Perkins, Hickox and Waite do file herewith, in the office of the secretary of state of Ohio, a copy of the deed and grant to them as afore-

said, and do further certify as follows : That the name which they have assumed to themselves, and by which such corporation shall be known, is, 'The Atlantic and Great Western Railway Company of Ohio.' * * * No amount of capital stock is deemed necessary for the construction of the said railroad, as the same has already been constructed; but $500,000, divided into ten thousand shares of fifty dollars each, has been fixed upon as the amount of the capital stock of said corporation."

On the 10th of November, 1871, a meeting of the directors of the Atlantic and Great Western Railroad Company of Ohio was held at Cleveland, and an agreement of consolidation between the Atlantic and Great Western Railway Company of Ohio and the Atlantic and Great Western Railway Company of New York and Pennsylvania was approved, and the name of the new corporation was declared to be " The Atlantic and Great Western Railroad Company." Such agreement was also approved by the stockholders of the Atlantic and Great Western Railway Company of Ohio, at a meeting held at Cleveland, November 17, 1871, and by the Atlantic and Great Western Railway Company of New York and Pennsylvania, at a meeting held at the city of New York on the 14th of November, 1871. The capital stock of the consolidated company was fixed at $50,000,000, being the $49,000,000 of stock of the original Pennsylvania Company, and the $500,000 of stock of each of the Ohio and New York companies.

On the 16th day of December, 1871, this consolidated company executed the mortgage in suit to Taylor and Dunphy. This mortgage, in its eighth article, covenants " *that the premises are free from all incumbrances whatsoever*, except the outstanding bonds referred to in the sixth article hereof," which bonds were those issued under the mortgages to Flagg and Stedman, and which were then stated to be outstanding to the amount of $3,754,800.

It appears from Mr. Hodgskin's deposition, that similar

proceedings were taken under the consolidated Penn mortgage in Pennsylvania as were taken under such mortgage in Ohio.

In the month of May, 1870, a contract and agreement called "an official scheme of reorganization" was entered into, as appears upon its face, by the "bondholders, shareholders and creditors" of the Atlantic and Great Western Railway, a corporation organized under the laws of the states of New York, Pennsylvania and Ohio, parties of the first part, and McClellan, Thurman and Duncan, parties of the second part, which recited that such company had failed to pay its coupons, acceptances, and other floating debts and liabilities, and that its present income was insufficient to meet its obligations; that there were differences of opinion between the parties of the first part as to their legal rights and priorities, and that they agreed that the consolidated, *i. e.* Penn, mortgage upon the property should be foreclosed, and the mortgage property sold and purchased in by the parties of the second part, as trustees for the parties of the first part, and be paid for with the old bonds, debts and stocks; that a new corporation should be formed, *competent to create and issue* the several classes of securities and stock in said agreement referred to; that new mortgage bonds, securities and stock of such new company, should be issued in exchange for the bonds and shares and stock of the old company, and that the old bonds, coupons, certificates of debenture, indebtedness and shares, should be forwarded to Bischoffsheim & Goldschmidt, to be by them deposited with the Union Bank of London, and to be sent by said bank to said trustees whenever they require the same to enable them to bid or pay for the property. As matter of fact, no shareholder of either of the old companies joined in the execution of this official scheme of reorganization.

The mortgage in suit divides the bonds issued thereunder into three classes, to be known respectively as first, second and third mortgage bonds.

Taylor agt. Atlantic and Great Western Railroad Company.

The question of how many of these bonds were actually issued under the reorganization scheme in exchange for the old bonds and stock and debts of the previous Atlantic and Great Western Railway Company, is rather a question for an accounting than for the trial of the cause; but it appears from the statement introduced in evidence that there were issued for such exchanges, of the first mortgage bonds $12,088,200, and of the second mortgage bonds $7,074,000; that there remained, unused by the trustees, of the first mortgage bonds $2,024,500, and of the second mortgage bonds $3,473,500, and such unexchanged bonds were known as " Surplus Bonds," and were disposed of by the company.

This statement also shows that $2,416,300 of the first mortgage bonds were reserved for the purpose of retiring the bonds issued under the Flagg and Stedman mortgage, known as the Ohio Divisional Mortgage. As matter of fact, this exchange was not made, and the bondholders under the Ohio mortgage are now pressing for a decree of sale in Ohio.

The bonds called " Surplus Bonds " were sold by the company under prospectuses which were issued soliciting subscriptions therefor.

The primary object of effecting the sale of these surplus bonds was stated in the prospectus to be, the " laying of a third rail, so as to narrow-gauge the road and to place the road in a high-class condition, with additional tracks, and to provide improved station accommodation."

The Banque Franco-Egyptienne is the owner and holder as collateral security of $1,816,000 of the bonds described in the mortgage as second mortgage bonds. There is due to the banque on its loan the sum of £231,675 4s. 0d., with interest from June 5, 1874. This is equivalent in American currency to the sum of $1,158,380, with interest. The history of this loan is stated in the depositions of Mr. Warnock and Mr. Hodgskin. Mr. Warnock produces a telegram from James McHenry, in London, April 17, 1872, as follows:

"We have * * * borrowed £112 10s. 0d. on every

$1,000 second mortgage, paying two and a-half per cent commission for six months, with liberty to renew the loan for same period for a similar commission, and paying five per cent interest per annum and giving option of purchase. This option will be [this operation will pay] for the 15,000 tons of steel rails, provide for all coupons due this year, and reimburse £150,000 credit already sent and place $1,500,000 at your disposal."

The company approved this loan by a telegram to McHenry, April nineteenth, as follows:

"The executive committee approve, with thanks, arrangements for sale of surplus firsts and loan on seconds."

It appears, also, from Mr. Hodgskin's deposition, that on the 20th of April, 1872, McHenry wrote a letter to McClellan, confirming his previous dispatch, in which he used this language:

"I inclose copy of the telegram sent you in regard to the disposal of the surplus bonds. On discovery of the stupid error in transcribing, which had no doubt at once been put right in your own mind, I forwarded a correction. In round figures, this operation has secured nearly £700,000. The shipment of the 10,000 tons will be completed during this month, to be followed by 5,000 tons more. * * * The Banque Franco-Egyptienne, who are the real parties with whom we are dealing through Bischoffsheim & Goldschmidt, submit the affair to their board in Paris on the twenty-second."

It appears satisfactorily from the depositions of Mr. Warnock and Mr. Cassel, and from this correspondence, that the amount advanced by the banque was invested in steel rails for the benefit of the company.

*W. W. McFarland*, for plaintiffs.

*Clarence A. Seward, George B. Hibbard, Charles M. DaCosta*, for the Banque Franco-Egyptienne, defendants.

DANIELS, J.— The object sought to be obtained by this action is the foreclosure of a mortgage executed on or about the 16th day of December, in the year 1871, by the Atlantic and Great Western Railroad Company to the plaintiffs, as trustees, upon its line of railroad extending from Salamanca, in this state, to Dayton, in the state of Ohio, and upon other property owned or leased by it. This mortgage was made to secure three classes or series of bonds issued by the company, and designated first, second and third mortgage bonds. The first series was not to exceed the sum of eighteen millions, the second not to exceed twelve millions, and the third not to exceed twenty-nine millions of dollars, in American gold coin, in amount, and each on its face bears interest at the rate of seven per cent, payable semi-annually. These bonds in terms referred to the mortgage given for their security, and consequently operated as notice to the persons or parties receiving them, of the contents of that instrument.

For that reason the defendants, who received a portion of the second class or series, cannot be permitted to claim that they took them in ignorance of any of the facts whose existence was disclosed by the statements of that security. Most of these bonds were issued and used to replace other bonds issued by previous railroad corporations, some of which owned portions of, and one of which acquired title to all, the property of the present corporation. And the residue, amounting in no event to more than $5,300,000, and probably not exceeding $1,750,000 of the first mortgage bonds, and $2,000,000 of second mortgage bonds, were known as surplus bonds and used in the purchase of rails and the borrowing of money for the use of the railroad corporation. To the defendant, The Banque Franco-Egyptienne, there were transferred, of this portion of the second mortgage bonds, the sum of $1,816,000, or about that amount, to secure a loan made by it to the agent of the railroad company, and for its use and benefit upon which the sum of $1,158,380, besides interest, still remains unpaid. The mortgaged property is greatly

inadequate for the security or payment of all the bonds issued under the mortgage.

The whole amount authorized was fifty-nine millions of dollars, while the property subject to the preceding incumbrances upon it will not probably sell for more than ten or twelve millions of dollars at most.

The case shows that of this amount authorized, over fifty-six millions of dollars in these bonds were actually issued, and the consequence therefor must be that a very large deficiency of the debt imposed by them will, under the most fortunate circumstances, remain unpaid. For that reason, and to protect itself against this prospective loss, the banque, whose debt is undoubtedly valid as an obligation against the company, has intervened for its own protection against all the bonds which may have been exchanged for the debts of other corporations owning previously the same property.

The banque is a banking corporation existing under the laws of the republic of France, and carrying on its business in the city of Paris, and appears to have acted in the utmost good faith in making the loan and receiving, for its protection, these securities, and it is entirely justifiable for it to endeavor to maintain a priority over those whose bonds were received merely upon the consideration of a pre-existing indebtedness.. But it can only be permitted to succeed in the effort by establishing some legal or equitable infirmity in the titles or rights of the other parties claiming protection under the mortgage.

For the purpose of maintaining that position, it has been alleged, in its answer, that the exchanged bonds were issued without consideration and were, also, illegal and void.

In what respect this illegality consisted has not been fully set forth but as that has been amplified by the evidence, the case may be regarded as sufficiently before the court to require the consideration and decision of these points. If they apparently ought to be determined adversely to these other parties they probably would be required to be brought before the

court in order that they might be furnished with an opportunity of showing that their bonds were not without consideration and were not illegal or void. For most purposes they are represented by the trustees under the mortgage in contest concerning the mortgaged estate. But when the validity of the claims of the respective holders are brought in controversy it may well be doubted whether that should be heard and decided without their presence. If the decision should be in their favor of course no grounds of complaint on account of their not being parties can exist

But if it should, upon the facts now presented, be adverse to them, then an opportunity for a further hearing on their own behalf would probably be found to be an intervening necessity in the case.

As the facts now appear, the corporations preceding the defendants, giving the mortgage and issuing the bonds, were all hopelessly insolvent.

Divisional bonds had first been issued and secured by mortgages upon the respective divisions of the railroad, situated in the states of New York, Pennsylvania and Ohio. And they had been succeeded by other bonds and a mortgage upon the consolidated line, extending through or into these states. The holders of these bonds became dissatisfied by reason of their non-payment, and proceedings were taken for the foreclosure of three of these preceding mortgages, and the sale of the property for their benefit. While these proceedings were pending an arrangement was made for the disposition of the property, in pursuance of which it is insisted that all the bonds in dispute were lawfully issued. And in order to determine the present controversy, that arrangement and its validity will require examination.

The stockholders were not included as parties in it, and with so great a load of indebtedness upon the property of the corporations whose stock was held, they had no tangible interests requiring serious consideration. The demands of the creditors could be but partially paid, upon a disposition

of the property to others, and for that reason it had become necessary for them to do what appeared to be most expedient for their own protection.

With this end in view they made the arrangement and entered into the agreement, which afterwards became the foundation for the exchange of these bonds, or the substitution of those issued by the railroad company for those previously issued and secured upon the property.

By that arrangement and agreement it was settled that the property should be sold under the foreclosure proceedings then in progress; that it should be purchased by General George B. McClellan, Allen G. Thurman and William Butler Duncan, as trustees for the bonded creditors and others; that they should convey the Ohio portion of it to George B. Wright, Reuben Hitchcock, Joseph Perkins, Charles Hickox and Morrison R. Waite, the present chief-justice of the United States, under and by whom a new corporation was to be formed in the state of Ohio and other similar corporations were to be otherwise formed in each of the states of Pennsylvania and New York, which were respectively to become the grantees and owners of so much of the property as was situated within the states in which they should exist and afterwards they were all to consolidate themselves into one corporation owning the entire property which should issue and secure the bonds required to carry into effect the agreement for their substitution as well as to supply the contemplated financial necessities of the consolidated corporation.

In this manner the old bonds were to be finally retired and the new ones substituted in their place and it was substantially carried out and observed in what subsequently transpired.

Whether it was a lawful agreement and lawfully performed is the substantial controversy existing in this case. The learned counsel representing the banque insist that both the agreement and what was transacted under it were in contravention of the laws of the several states in which the business was done. And for the purpose of sustaining their position

Taylor agt. Atlantic and Great Western Railroad Company.

copious references have been made to these laws. But in the views which have impressed themselves as the most reliable to be followed in the disposition of the case, many of these references will be found not to require particular consideration. It may be, as it should be, conceded at the threshold of the discussion that corporations, railroads as well as others, must be confined in their acts within the limits of the authority affirmatively given to them or appropriately requisite for the attainment of the objects they are designed to accomplish. And under the effective operation of this principle for whatever they do, some warrant of legal authority must be found. The principle is highly salutary and its observance should be watched and guarded in order to prevent corporations from becoming, what they are so often inclined to become, unrestrained and destructive monopolies of individual enterprise. But if, with that restriction, their acts appear authorized, then they are to be sustained the same like all other exertions of lawful authority.

It was obviously not unlawful for the creditors and bondholders to agree that a sale should be made of the property mortgaged by way of security for their debts, and that it should be purchased by the three trustees selected by them for their benefit. They had the right to bid the property off themselves, or to agree that it might be done by those persons as their trustees or agents, and that they should hold or dispose of it for the ultimate benefit of these beneficiaries. To that extent the arrangement and what took place pursuant to it transcended no legal restraint whatsoever. It merely provided what was strictly requisite for the creditors' own protection, and the subsequent conveyance of a portion of the property to the individuals who formed the Ohio corporation, and the residue of it to the corporations respectively formed in Pennsylvania and New York, were acts which were equally well authorized. The vice inherent in what transpired is not attributed to these different steps, and no reason can be perceived for the support of any such imputa-

tion.   But that has  been affirmed to have originated in what
afterwards took place.

It was urged that the consolidation was more extended
than had been provided for by the laws of this state.   But
that is opposed to the admission made on this subject by the
answer of the banque, and by which it could be reasonably
held to be now concluded.   That, however, is not necessary,
for the statute of this state does not restrain the power of
consolidation within limits so restricted.   It permits any rail-
road corporation organized under the laws of this state, or of
this state and any other state,  and  operating a railway either
wholly within or partly within, and partly without this state,
to merge and consolidate its capital stock, franchises and prop-
erty with the capital stock, franchises and property of any
other railroad company, or companies  organized  under the
laws of this state, or under the laws of any other state or
states, whenever their railroads may form a continuous line of
railroad (*Laws of* 1869, *vol.* 2, 2399, 30, *sec.* 1).

And the right or ability so to consolidate has not been
made dependent upon the circumstance that no previous con-
solidation of one of the  constituent  railroad companies shall
not previously have been made, but it has been generally con-
ferred upon all  railroad companies  existing as such, subject
only to the conditions that the railways must be so situated as
to form a continuous line, and that  they shall not be  parallel
or  competing  lines  of  railroads (*Id.*, *vol.* 1, 2403, *sec.* 9).
Subject to those restraints, all  railroad companies have been
given this right or power of  consolidation.   And it may
be effected by any two or more railroad companies, which was
all that was done in this instance.   It has not been insisted that
any irregularity or infirmity existed in the organization of
either of the corporations formed in this state and Pennsylva-
nia, for the purposes of carrying into effect the agreement
and arrangement of the bondholders and creditors of the pre-
viously existing corporations.   But it has been insisted that
the corporation formed for that purpose in the state of Ohio,

was defectively and irregularly formed, for the reason that the arrangement first entered into, contemplated an organization under one law while it was, in fact, made under another and later statute of the state. This, however, cannot be a matter of any controlling importance, for the reason that the later act provided for the corporate organization in accordance with the agreement actually made, even though for want of the assent of the stockholders, that could not be accomplished under the preceding law. The act under which the corporation was formed, according to the evidence of senator Thurman and that afforded by the certificate filed in the office of the secretary of the state of Ohio, was that of 1868 as it was amended and extended in 1869. Together they applied to, and provided for, the sales of railways in the hands of receivers as this portion of the previously consolidated railroad then was. And according to their titles and also the terms of the act of 1868, they ostensibly applied only to unfinished road-beds.

But the act of 1869 went further, for it included within the authority given by it all real and personal property — road-beds, rights of way, fixtures and franchises — of any railroad company in the state of Ohio, that either had been or should be sold pursuant to a judicial decree, where the sale had been confirmed by the court directing it ( *Wilcox's R. R. Laws of Ohio*, 224, 227). The terms of the laws of 1869 were more extended and unrestrained than those of 1868 and were not limited, as this act was, to companies that had not completed any part of their roads. But it included all railway property in the hands of receivers, and provided that they might sell the same and the title thereto with all the rights, liberties, faculties and franchises, and that the same should vest in the purchaser or purchasers thereof as fully as the same had been exercised and enjoyed by the railroad company itself. The proceedings had for the sale of this portion of the railroad were evidently taken under these statutory provisions and the court in which they were

pending apparently regarded them as fully authorized by these acts. And so much certainly has been conceded by the defendant's answer and by the argument made in its behalf in the presentation of this case. Besides that, some weight should be accorded in making this construction of the general and unrestrained language of the act of 1869 by which the preceding act of 1868 was enlarged to the judgment of the eminent men who purchased this portion of the railway under the decree of the court in the state of Ohio, and to that of those who succeeded them in the purchase and formed the Ohio consolidating corporation. They supposed they were observing all the restraints while they were exercising the authority of these acts and in that they were confirmed by the action of the court in Ohio so far as that added its sanction to the proceedings by ordering and afterwards confirming this sale. These proceedings were further confirmed by the deed made by the receiver pursuant to the sale and by the subsequent conveyance by the purchasers to the persons who proceeded to form the corporation and, as they acquired title to the corporate property and franchises in this way, they appear to have been abundantly indorsed with the further authority exercised by them of actually organizing the new corporation. That was done under the second section of the act of 1869 which, in its terms, seems to have been ample for this purpose, for it provided that these purchasers might form the corporation and when formed that it should have perpetual succession under the general railroad laws of the state regulating corporations and hold the property, rights and franchises purchased free and discharged from all liability for the debts of the original corporation ( *Wilcox's Railroad Laws of Ohio* 227, *sec.* 2). According to this authority the three corporations must be regarded as having been lawfully formed which afterwards entered into the consolidated company executing this mortgage. They each actually existed and had the power to exercise all the functions secured to such corporations under the laws of their respective states. And while it was in terms

provided that the newly-formed corporations should hold the property purchased free and discharged from all liability for the debts of the original corporation, as that was a provision made solely for its benefit and advantage, it could be waived by it; for this power of waiver has been so far extended as to permit it to be exercised as to statutory and even constitutional advantages (*Buel* agt. *Lockport*, 3 *Com.*, 197; *Lee* agt. *Tilleston*, 24 *Wend.*, 337; *People* agt. *Murray*, 5 *Hill*, 408; *Houston* agt. *Wheeler*, 52 *N. Y.*, 641).

The statute contained no prohibition preventing the new corporation from assuming the debts of its predecessor in whole or in part, but it simply exonerated it from liability for them. And that privilege was waived by the agreement pursuant to which the sale was made and the new corporation was formed. For it was a portion of the plan that the debts should be carried along and be assumed by this corporation, and the one which was ultimately to arise out of the consolidation.

That was the primary object of the creditors themselves, for whom and under whose agreement these proceedings were instituted and carried into effect; and they were not prohibited by any law from providing for their security and protection in this manner.

The sales made — the corporation formed — and the consolidation finally resulting, were merely so many instrumentalities adopted for the protection of their interests, which were superior to those of others over the property and franchises affected, and which they were at liberty to resort to for their own indemnity.

And the conveyances and other instruments executed and delivered in the course of the proceedings, exhibit the continued existence of the intention to preserve and carry into final effect this controlling design. The proceeding, it is true, was a circuitous one, but that was rendered necessary by the circumstance that the laws did not provide for the original formation of the continuous corporation, whose rail-

road was to extend and be operated in all three of the different states ; the only way in which that could be lawfully accomplished at that time was by the formation of the three local corporations in the different states, and then to have them avail themselves of the statutory powers of consolidation, which the laws of each state had provided.  The consolidation was formed previous to the system formed by chapter 430 of the Laws of 1874, in this state, amended by chapter 446 of the Laws of 1876, and accordingly was deprived of the advantages of those provisions.  It could only be formed, as it was, by first creating the local corporations, and then allowing them to avail themselves of the powers given for that purpose to existing railroad companies.

The companies which were formed under the bondholders' agreement, appear to have observed the formal requisites necessary to make a lawful and complete consolidation.

But, while that may be the case, it has been strenuously urged that it could not be done with the view that the consolidated corporation should assume the preceding liability of the corporations whose property was sold under the foreclosure proceedings, so that this purpose could in the end be secured.

The objection to the exercise of this power in this state, has been chiefly placed upon a provision contained in chapter 140 of the Laws of 1850, which was rendered applicable to the consolidated corporations by section 8 of chapter 917 of the Laws of 1869.

By this it was provided that railroad corporations could, from time to time, borrow such sums of money as might be necessary for completing and finishing or operating their railroad, and issue bonds for the money borrowed and secure their payment by a mortgage upon the corporate property and franchises (*Laws* 1850, 225, *sec.* 28, *sub.* 10).

But, while this may have been designed to carry with it an implication that mortgaged bonds could not be issued for any other purpose, it was still competent for the same author-

ity that provided for the restraint, afterwards to remove it, and that in effect it did, as to consolidations, by the second section of the act of 1869. For, by that, unlimited authority was expressly given to the directors of the companies now proposing to consolidate, to enter into an agreement prescribing the terms and conditions for the consolidation, and the mode of carrying it into effect (*Laws of* 1869, *sec.* 2, *sub.* 1). And upon that being submitted to the stockholders of the respective companies and securing the approval of two-thirds of their votes for it, the agreement made became the lawful basis of the consolidation designed to be effected (*Id.*, *sub.* 2).

Such agreements as this statute authorized appear to have been entered into and sanctioned in the manner prescribed by the terms of the act. That was first done for the purpose of creating the consolidation between the corporations formed in this state and the state of Pennsylvania, and again between the company resulting from this consolidation and the corporation formed in the state of Ohio. And, by the terms of the agreements made, it was stipulated that all rights of creditors should be preserved unimpaired, notwithstanding the consolidation; and debts, liabilities, obligations and duties of either of the corporations should thenceforth attach to the new corporations, and be enforced against it to the same extent, and in the same manner, as if said debts, liabilities, obligations and duties had been incurred and contracted by it. The preceding corporations had been respectively subjected to the obligation of carrying into effect the agreement and plan of the bondholders, and they were not prevented from assuming by any disability to which they had been subjected, for they merely assumed the liability or obligation to carry along and preserve the existence of these debts until the consolidation could be formed and the new mortgage bonds could be issued by that company for them.

That transcended nothing contained in the act of 1850, restraining the power to borrow money on the mortgage bonds of the company to that which should be necessary for

completing, finishing or operating the railroad. For this did not prevent the company from assuming the obligation to recognize and carry along these debts, as simple liabilities or obligations, but only from securing their payment by a mortgage of its property and franchises. But while that might not be done by the local corporation, the one produced by the consolidation was not in that respect restrained, for it was empowered to carry out and perform the terms of the agreement whatever they might be, which was made as the basis of such consolidation after it had received the sanction of two-thirds of the stockholders, and by those terms construed and understood, in view of what had previously taken place; the evident intention was that the railways in each of the three states should be sold for the benefit of the creditors, whose demands far exceed its value, that these demands should be transmitted through the local corporations to the new consolidated company to be formed, and then secured by its bonds and a mortgage upon its property. This was the substance of what transpired and it was practically embodied in the terms of the agreements for the consolidation. Its existence is clearly indicated by the documents and other evidence in the case, and it was substantially acknowledged as a part of the basis of the consolidation and of the mortgage now in process of foreclosure in this action.

It has been objected that the company was not empowered to assume this obligation for the security of these demands by mortgage bonds, because preceding mortgages were in terms excepted from the obligations which were to attach to, and rest upon, the new company (*Laws of* 1869, 2402, *sec.* 5). But that argument is deemed to be fully answered by the circumstance that there were no such mortgages existing against the constituent consolidating company in this state. And no mortgage was assumed either by that or either of the other companies in point of fact. What was assumed and carried along, were, as the foreclosure sales left them, simple debts which were to be provided for by the final organization, and

that was not prohibited but in terms allowed by the very general authority created by this act of 1869.

That this was not opposed to the legislative policy of this state relating to railroad corporations has been since more clearly manifested by chapter 430 of the Laws of 1874, and chapter 446 of the Laws of 1876. For they were enacted to render its observance more feasible and practicable. They have now created a complete and plainly intelligible system for doing all that was accomplished in this instance. But it is not to be inferred from their enactment that the plan pursued in this case was not within the limits of the authority previously existing upon the subject.

That is not to be determined by the fact that these acts were deemed essential still by the legislature, but by the terms and scope of the pre-existing laws. And they, as already suggested, are deemed broad enough to sanction the proceeding by which the liabilities intended to be preserved were finally transferred to the consolidated company, which executed the present mortgage for the creditors' security. The laws of Ohio under which the consolidation was made, were in their terms substantially the same as the act existing in this state (*Wilcox's R. R. Laws*, 134, 140). It was permitted to be done on the basis of a joint agreement, prescribing the terms and conditions thereof after that had been adopted by a vote of two-thirds of the stockholders of the different companies. When that was done and the agreement or a certified copy of it was filed in the office of the secretary of the state, it was made the agreement and act of consolidation of the two companies, as that was also provided for by the statute of this state. Upon this subject the laws were practically alike, and they each in terms delegated to the directors and stockholders of the different companies full power to declare and adjust the terms of the consolidation, which necessarily included that of providing for the security of the debts and obligations carried over and to be assumed by the final organization.

The law of Pennsylvania in plain language provided that the consolidated company might issue bonds secured by a mortgage of its property, privileges and franchises and exchange them for the debts of the respective companies merged or consolidated. And the only restraint imposed upon the exercise of this authority, was that the bonds to be issued should not exceed the whole of the debts of the companies merged in the consolidation (*General R. R. Laws of Penn.*, 121, 122). This act when it was passed seems to have been applicable only to railroad corporations chartered by that state, but it was afterwards so enlarged as to allow similar consolidations when one of the companies existed wholly or partially out of the state of Pennsylvania (*Id.*, 81). In that state, therefore, the authority seems to have been plenary over this subject allowing, in direct terms, all that was done for the purpose of effecting the consolidation and carrying the agreement and plan of the creditors into execution. While this was within the spirit and terms of the laws of New York and Ohio, it was literally provided for by the state of Pennsylvania. And under all these laws it was a duty created by the constituent corporations which were brought into being merely to promote and consummate the agreement and plan of the creditors themselves and imposed by the concurrence of all through the consolidation upon the company finally formed. The scheme devised, divested of the peculiar forms followed for the purpose of carrying it into effect, was, in substance, the sale of the property under the foreclosures for the benefit of the creditors — its purchase by them through the agency of the three persons selected by them — and who acted as their trustees — and the sale to the railroad company formed by the consolidation of the intermediate corporations and a mortgage executed by the latter to secure its obligations to pay the purchase-price. This is what the transaction really was ; and in that respect it did not materially differ from an ordinary sale of property on credit, where the purchase-price is secured by the mortgage of the purchaser given upon

the property. Upon such a sale the power to buy would seem to include the further power to become obligated to pay the price of the property bought either in cash or upon credit and in the latter case to secure by mortgage its future payment. While the company held property so purchased it would be plainly estopped from denying its liability for the price ( *Whitney Arms Co.* agt. *Barlow*, 63 *N. Y.*, 63).

And the same estoppel would conclude those deriving title under it. In any view the corporation was legally obligated to issue its bonds and provide for their security as it did by the mortgage in suit. And those delivered by way of substitution for debts existing previously which were assumed and to be protected by the consolidated company were taken upon sufficient consideration to render them binding obligations.

The banque advanced its money on vouchers plainly referring to this mortgage and constructively giving it notice of its provisions and purposes. Both classes of obligations are consequently equally entitled to be sustained, and one cannot be held to have obtained any preference over the others.

It has been urged that the covenant that the property conveyed was free from these preceding incumbrances, should be held to preclude the adoption and securing of the debts previously secured by them. But this argument cannot be regarded as sound, for the reason that while it was true these incumbrances had been extinguished by the foreclosures and sales, they nevertheless left the unpaid and unsatisfied debts still in full force and vigor, capable of being transferred to, and assumed by, the final organization as they were. That was the object of the creditors in taking the proceedings which were carried on and maintained, and the intention to accomplish it was the controlling consideration in all that was performed by them. It was both legal and equitable in its nature and no provision or principle of law has been discovered which would require its observance to be denied. Various authorities have been cited as warranting the conclusion that this consummated arrangement carrying out as it does the

design of the parties having the authority to control the disposition of the property, should be held to be unlawful. But an examination of them has produced the conviction that they are in no respect in conflict with the legal propriety of the course which has resulted in the creation of this mortgage.

It has also been objected by the learned counsel representing the plaintiffs, that the banque having derived its entire right to protection under this mortgage, cannot assail its validity, so far as it may be necessary for the security of the bonds received by the creditors. But it is not necessary to decide whether that be the law or not, as these bonds must be regarded as legal obligations against the railroad company.

The creditors whose debts have been assumed are equally entitled to protection as the banque, whose debt was created by a loan of money on the faith of the hypothecated bonds. Both are lawful obligations, and the other creditors have neither done nor authorized any thing depriving themselves of that equal right to protection which has so often been held to be equity itself. The facts that one class of the bonds is held as security for a loan made directly upon them, while the others were transferred in satisfaction of debts, will not warrant any legal discrimination between them. The consideration for each was good, and that the law holds to be sufficient to sustain them. This case might probably have been fully disposed of by limiting its consideration to the effect upon it of the laws of this state. But the range taken in the arguments, which were very able and learned, indicated the existence of a different opinion on the part of the counsel, and for that reason the controversy has received a much more extended consideration than would otherwise have been regarded as necessary for its determination. That has resulted in the conclusion already mentioned, that the bonds which have been issued by the railroad company to the creditors of the preceding company, were lawful obligations secured by the mortgage. And the defense of the defendant, so far as it depended on a different view of their validity, must be overruled.